We have four cases this morning. The first one is Keneka Corporation v. JBS Hair. Council, ready to proceed? We are. Please come forward. Mr. Sacksteder? Yes, Your Honor. Good morning, Your Honor. This is Michael Sacksteder, Fenwick & Wess, on behalf of the appellants in this case. May it please the Court. The District Court made numerous errors in this case that mandate reversal or, in some instances, new trial. However, in the interest of time, I'd like to focus on a couple of the most important ones. Well, that's useful because the first question I was going to put to you is, if I'm not mistaken, you listed ten issues in your brief. Is that correct? I believe that's correct, Your Honor. If you had to pick one or two that you really thought you could win on, are those the ones you're going to speak about this morning? I, of course, think I could win on all of them, Your Honor, but the ones that I'm going to speak about are the ones that I think are both the strongest and the most important. That's what we want to hear. Thank you. All right. The first one is the District Court's creation of effectively an impurities loophole in the claim construction, allowing the plaintiff in this case to satisfy a numerical proportional requirement of the claim, of a consisting-of claim, and allowing that to be satisfied even though there undisputably were – it wasn't satisfied without this impurities loophole. I'll go ahead. You say impurities loophole as if the Court hadn't said impurities normally associated with a component of a claimed invention are implicitly adopted by the ordinary meaning of the components themselves. How is that a loophole? That is the statement that that relies on. That's the law. Well, it is, but it comes from the Conoco case of this Court. That's right. And that case, the place where that statement appears, is in a section that is construing the claim term consisting-of. Specifically, it's in a section called – the title is consisting-of in quotation marks. The entire discussion is about whether a particular chemical in a particular mixture is an impurity and whether that's part of the construction. That is something different. An additional – But we concluded that when we conclude the restriction-of is not absolute, the reasoning is equally applicable to a claim preceded by comprising, isn't it? I don't think so, Your Honor. The comprising claim in this case requires a particular numerical proportional requirement for the flame retardant to be in the mixture. The ordinary meaning of the term doesn't depend on the preceding transition phrase, does it? I think in this case it does, or at least the inclusion of impurities does, because this is a place where you actually have to have – and there's no dispute that the requirement is for linear molecules to be – The evidence appeared to be that it made no difference whatsoever.  I think that the evidence showed that it makes a huge amount of difference. Let me ask the question, just the same question a little bit differently. All of us hope that someday we'll run into something that is truly pure, but in the real world I know very few things that are. Wouldn't it be fair to say that just about every chemical composition necessarily has some impurities in it? And that's probably correct, Your Honor. That is probably correct, Your Honor. But those impurities shouldn't count to the 5 to 30 parts per weight of flame retardant. Now you're arguing your infringement claim, though. Are you agreeing that the construction of this compound we're talking about doesn't require it to be pure or substantially pure? I don't think the claim says anything about impurities. I don't think anything in the intrinsic record says anything about impurities. If it doesn't, then wouldn't the normal rule, since almost every chemical compound presumably contains some type of impurities, that be included unless it said 100% pure or substantially pure or the like? And wouldn't one of ordinary skill know exactly that concept? That's the case, but the claim requires a particular proportion of linear molecules, and it's fine. If there are other molecules that are branched, as long as you can satisfy that threshold. That's not a claim construction argument. That's your infringement argument about whether there are enough linear molecules as opposed to the branch molecules. And on that, isn't there differing expert testimony on which the jury could have based its verdict? I think it's both, Your Honor. I think it is a claim construction argument because I don't think that for this kind of limitation, in a consisting of claim where you have to get up to a certain point, that I don't think that it provides a definite claim. Do you agree that the jury could have, and apparently did believe Dr. Jacobs' explanation, that while bromated epoxy flame retardant polymers with zero branches could hypothetically be made, doing so confers no advantage to justify the extra cost and effort? I don't agree with that. You don't think they could believe that? I think that the testimony from both experts was that if a thing that is called an impurity was intentionally induced and changes the properties of the chemical, of the composition, then it does not constitute an impurity. Now that, again, is sort of an argument under the construction that includes the impurities, but again, I don't think that Conoco was saying that impurities should be included at all in this type of claim limitation where you have a specific number that you have to reach, and that number has to be linear molecules. You can't say that some of them are just linear enough. The evidence showed that a linear molecule is defined as being not branched. This is a situation where the term is defined by its opposite. The opposite is branched. So if you have a branch molecule, it can't possibly be a linear molecule. So you can't say that branching on a linear molecule is an impurity in that molecule. Now there may be extra molecules that have different components. You had like an argument against their expert testimony and that their expert testimony was wrong, but the district court didn't exclude it unless you're arguing that it's completely unreliable. It seems like it can support the jury verdict. I think that— You count branching differently than their expert, right? Their expert looked at branching in a certain way and found it was what, like 2% to 5% at best. Your expert looked at it in a different way and said it was 70% to 80%. I think that's correct. I think that our expert looked at it in the correct way. Is that a factual question? I don't think it is a factual question. How is it not a factual question? Because the question is whether the molecule itself is branched. There can be one branch and it can be like that. So then you're arguing that their expert's testimony should have been excluded because it doesn't properly opine on this issue. That's one possibility. I don't believe that was raised. Well, then you waive that. So the expert testimony is in. Assuming that expert testimony is right, why doesn't that support the jury verdict on infringement? Well, what I'm trying to say is that the construction that includes impurities leads to absurd results where you can just say their expert testified that he didn't know where the line was. How much impurity do you need in order to be, or how much branching do you need for this to be an impurity that somehow gets to count anyway toward the linear molecule requirement as opposed to... Hang on. I just want to make a record. Just for the record, when Judge Hughes said you waived that, you didn't answer him, but you raised your palms upward, which indicates to the court that you're saying yeah. I don't believe we raised that below, Your Honor. Okay. You can continue. Okay. So what I'm trying to say is that the construction that includes impurities for this kind of numerical requirement in a consisting of claim, which is not what Conoco was about. Conoco had a statement such as Your Honor read, but that was referring specifically to additional materials in a consisting of claim, not a numerical requirement in a comprising claim. And I think if you have that impurities exception, then you end up with absurd results where the other side's expert can't say where the line is. You know, it's effectively an indefinite claim. Nobody can tell. Well, now you're raising an argument you haven't raised at all that the claim's indefinite. I'm just saying the construction leads to results such as that. Well, you should have argued that. You may have actually had a good argument about whether this claim was indefinite or not, but it doesn't seem like you've raised that. Okay. That was not raised in our briefing. Correct, Your Honor. Okay. Now, that sounds like the first of your statement of issues. Before you run out of time, you said you had another one. Thank you, Your Honor. What do you care about? The entire damages case of the plaintiff in this case relied on a double hearsay document that is clearly inadmissible. It's Exhibit 115. How is it not a business record? 115 does not satisfy – well, first let's look at it. The testimony was that they keep these things in the normal course. They do them, I think, every month it was, and that this is one that was made in that normal course. How is that not a business record? Made by Conaca. And there are reasons to doubt that, which I will get into, but I think we have to look at the second layer of hearsay as well. Rule 805 says that each layer has to have its own justification. There is no justification. I assume you argued, or whoever handled it at the trial argued there were reasons to doubt that and argued it before the jury. Correct, Your Honor, and also argued it to the court, but it was their only evidence that purported to show any importation of UNO's products in the United States at all. It was their only evidence, it was their experts' only evidence, and Conaca's only evidence. And the testimony was that they had been doing the same thing for 50 years. That Conaca had been doing the same thing. They relied on information from unnamed third-party sources, wig makers outside the country, importers, retailers. That's why there's a business records exception. Those are not business records, though. Those are not records at all from the outsiders. There has to be, under Rule 805, there has to be a justification. A compilation kept in the normal course of business is a business record, is it not? It is a business record for, although I think that it doesn't satisfy the exception, and I hope to get to that, but it's a business record as to the first layer of hearsay. But the information it's based on came from anecdotal oral statements, out-of-court statements, oral, not business records, of these third parties, and they were provided to, allegedly, to Conaca. Conaca's sponsoring witness admitted, he doesn't know if they're true or not, he admitted that he thinks sometimes they are not true. They have to show that there is no lack of trustworthiness in both layers of hearsay. And here they admitted they are not trustworthy. And this was the only, this got before the jury. It shouldn't have. It was prejudicial. It was the only evidence that purported to show any kind of importation to the U.S. Have they been relying on those records internally as a business record for the last 50 years? The record that was created in Exhibit 115 was expressly and admittedly created for purposes of the litigation and no other reason. It is fishy for other reasons as well. It was not created at the end of the fiscal year as Exhibit 114 was. It was allegedly an update on 114 that was created in the middle of Conaca's fiscal year, and it was created in the middle of Conaca's fiscal year right before Conaca's expert report. We've got about two minutes left. You're using up your rebuttal time. I understand. It was admitted to be prepared for the purposes of this litigation. I think the law is clear that it's not admissible. Good morning, Your Honors. Anthony Dane, appearing for Conaca. For the same reasons, I'll just address those two arguments unless, of course, the court has questions. If I could do them in reverse order, just because of recency as I was writing my notes, on the damages section, as Judge Solis did very well on the hearsay exception, he even noted if there are dual hearsays, each one was a business record, and they sufficed. But the argument is not correct that this was the only evidence. In fact, these business records were corroborated at trial in impeachment and in direct evidence that UNO did the same thing. That's how they kept their business records. They talked to the wig manufacturers. They talked to the importers, and they talked to the retailers. That's how you gather your information. In doing so, it turned out at trial that the estimates of our expert were even slightly lower than the business plans of UNO that showed their estimates. That was a corroboration internally, even beyond getting through the hearsay exception. These were records that were kept in the ordinary course for 50 years. What counsel was referring to is because the expert's report and deposition had been taken well before trial, all 115 was was an update using the same information. It was not created. It was really just a summary of the compilation. Getting back to the impurity issue. Well, of course it was created. The question is, was it outside the normal course? That's correct, Your Honor. Yes, I suppose you could make the argument that everything an expert does, then, is created. With respect to the fire retardant, the testimony from both sides was that the patent identifies specific flame retardants. The flame retardants are manufactured with, as both experts recognized, some form of branching. That's an impurity. Your Honor, when you mentioned that in a perfect world we would have purity, I can recall so many cases where the statements are, you know, something is round. Well, substantially round, because the earth is round, but obviously not completely. So there's no perfection. But the key was, as Your Honor also said, that with respect to the impurities, they had no discernible effect. The only counsel I was accepting from that, judges. You know, no absolutes except, of course, judges. I want to make sure you understood that. Absolutely. Having done this for 35 years, I can think of no better exception. But with respect to the impurities. We see some pharma cases where we actually do see language describing the drug composition as pure or substantially pure. Do you think that would have made any difference here to the infringement claim if that would have been put in? If it had been put in, possibly. Possibly, Your Honor. I hadn't analyzed it in that concept, and I know those cases because there are some where it's critical that you have the purity. Here it wasn't critical because, as Dr. Jacobs said. But let's assume that a person of ordinary skill would understand when they read this patent and the specification that it was requiring certain amounts of the non-branched composition. Correct. And so they would understand that as you have to have that amount in a pure or substantially pure form. Correct. And that you couldn't count the non-pure forms. Correct. So why isn't that basically reading a substantially pure limitation into this? Well, first of all, we don't have those facts, so it wouldn't be. But if it did, then I think your question was right to the point. It goes to infringement because then you have what we ended up with is a semantical statistical argument. And it just flowed like this. Our expert looked at the number of monomers and said if you had 10 polymers with 50 monomers each, you have 500 monomers. If just 10 of those are branched, which is what he was finding, you have a 2% branching. Their expert said if there's a single branch on any polymer, you throw it all out. So he ended up with the 80 to 100% discount, which means they're all branched. So we actually, it was very humorous. Was there any discussion in the specification about how you would determine purity? Or was there any testimony how one of ordinary skill in the art would determine what is pure or not? There was none. And that's why the testimony at trial was that when you read it with this specific flame retardant, knowing as a person of ordinary skill in the art would that when you get it from a manufacturer, it's going to have some of those impurities, then you know that that's inherent in it. That's why we had the testimony from both sides. And there was agreement. Well, the testimony also was that it made no difference. Exactly. No discernible effect. And one of the troubling things is the counsel was ignoring the testimony even of their own expert. They raised this book called Flory, which they said was a Bible. And Flory itself is you should not, when you're dealing with this linear or nonlinear, when you have this branching that it said of small significance, that you should not have a harsh application of the definition trying to require everything to be purely linear. Otherwise, it said, and this is perfect as to what the court said, it would relegate the term linear polymer to the status of an ideal which may be approached but never realized. And so that's the problem. And in fact, in that case, it said you may have somewhere it's perhaps one unit in a thousand. In this case, our expert was saying you might have two units in a thousand. But when you say about one unit, our expert was closer to the Bible. Their expert was trying to argue it had to be one in billions. But that's not what their Bible said. And Dr. Ellison himself, when asked, he said he asked for perfection 100%. And then I asked him the question, OK, Flory, the Bible is different, though. Flory acknowledges that there are going to be some instances where branching has no discernible effect. So when you read, cite the record, I will. This is J.A. 1 0 7 6 1. No discernible effect on the properties of the polymer. Yes or no. And his answer was yes. So in the end, isn't that at worst expert to expert? And that's what the jury is for. Let me take you back just for a minute to the impurities issue. Sure. We've all agreed that some impurities, it's appropriate to recognize the existence of some impurities. Correct. But as I read the record, your expert and their expert agreed on one particular explanation or definition of what impurities should that phrase should be. Is that not correct? I'll follow. It's not. You're not entirely correct. I want to say that they they picked spots instead of the total. But let's go. We'll go with that. I'll follow. Let's go with that. Did you try the case? I did. Good. Why didn't the trial judge adopt the party's agreed definition? The trial judge came up with a different definition. Now, it can be argued there's no significant difference, but I'm not sure that's true. But why didn't the trial judge simply adopt the party's agreed definition? The court took and Judge Felice was very particular about this. He analyzed these things at length. He analyzed it. He looked at the entire record, not these parsing out, you know, one statement here, one statement there. And he came to what he believed was the most appropriate definition under the law. And if you look at Flory, if you look at the cases, I think he's correct on that. The key is that it should not or cannot have a discernible effect. I think in his mind he may have been looking ahead to what Judge Hughes was saying is this may relate more to how you're going to argue infringement than what is an accurate definition. Well, the parties agreed on a definition that included the notion of no discernible effect. Isn't that right? Correct. But the trial judge did not include that in his definition. The trial judge's definition was those deviations normally associated with the component of a claim by one of ordinary skill in the art. Deviations normally associated with the component of a claim. Right. That doesn't have the same limiting factor that the parties agreed to. No, first of all, I think it does in essence because he was looking at a broader scope, knowing that both parties agree that if you name a specific flame retardant, the manufacturer of that flame retardant, when it's manufactured, it comes with these. So he was saying if that's in the ordinary course of what you're receiving, it's to be expected. So I believe that's why he did it the way he did. But in the end, the testimony elucidated all that for the jury. There was no argument in the end that the jury could have been confused by the judge's definition versus the actual testimony. That leads me to a related question. I went through the trial judge's extensive charge to the jury and the way the trial judge integrated his explanations of what the law is and what the application of that to the case to each of the questions put to the jury. That was pretty impressive on his part. Is that typical or is that this particular trial judge? And it's this particular trial judge. And I will tell you, my partner and I, Mr. Taylor, try these cases. And in front of judges since, we've said, hey, I think this is a great way to do it. And they looked at us like we had two heads. And even in his verdict form, he integrated the verdict form into the instructions. I've never seen it, but I will tell you, if you don't know Judge Solis, he's remarkable in terms of his own preparation and analysis. He put so much effort into this. And I really think in the end when we talk to the jury, of course this is outside of the issue here, but when we talk to the jury, they love that because it helped them understand how the instructions relate to the actual verdict charges or the actual verdict form. So it is unique. Thank you for the clarification. Okay. Now, I, of course, would be happy to answer any other questions the court has. Okay. Thank you. Thank you, counsel. You never have to use all your time. I appreciate that. Sometimes less is more. I probably would. You have a minute and 55. Thank you, Your Honor. Quickly, the Flory reference actually states that the linear molecules are exclusively bifunctional. That means it only has two connecting points on the ends. And it talks about, again, branch molecules and linear molecules being opposites. In the issue about the construction of the construction. Is that all it said? It says a great deal, but I think that's the strong gist. And the portion that was discussed before was talking about separate molecules, not separate monomers in one molecule being branched. But if there are other molecules that are nonlinear, then those are, you know, have all the molecules not be branched. And that's what it was talking about. Not talking about having one monomer or two monomers or three monomers on one molecule be branched and say that's an impurity. On the issue of the construction of the construction, as you said, the experts did agree on a separate definition. Under that definition, I think there's no way that there can be infringement because there was unrebutted evidence that that. Did you try the case? I did not. I got that impression. Okay, so you can't add anything to why the judge went off on his own. I don't think anyone's inside the judge's head, but I'm certainly not there. On the Exhibit 115 issue again, the question of whether, and this is what the judge relied on was that 115 was an update of 114. The only portion of 114 that was allegedly updated were going completely from estimated numbers to actual numbers. There was no update of numbers that existed. There were no, you know, in spite of the testimony that there were travel reports that this was based on, they were never produced. In spite of the fact that they are saying that this is sort of a regular course of business, there is no intervening document between 2010 and 2012. Just suddenly this new one comes up in 2012 that was created for the expert to rely on. Your time's expired. Thank you.